CITY OF CHANUTE, City of Iola, and City of Fredonia, Plaintiffs,

v.

KANSAS GAS AND ELECTRIC COMPANY, Defendant.

No. 83 1104.

United States District Court, D. Kansas.

June 1, 1983.

Charles Apt, Glaves, Weil & Evans, Wichita, Kan. and Charles F. Wheatley, Jr., Don Charles Uthus, Peter A. Goldsmith, Wheatley & Wollesen, Washington, D.C., for plaintiffs.

Ralph Foster, J. Michael Peters, Wichita, Kan., for defendant.

Kansas Corp. Com'n, Brian J. Moline, Topeka, Kan., amicus curiae.

## MEMORANDUM

CROW, District Judge.

Plaintiff cities of Chanute, Fredonia and Iola (cities) have filed this action against Kansas Gas and Electric Company (KG & E) alleging violations of Sections 1 & 2 of the Sherman Act, Section 3 of the Clayton Act, and K.S.A. §§ 50–101, 50–112. Cities have brought suit under the appropriate jurisdictional statutes, 15 U.S.C. § 15 and K.S.A. §§ 50–108, 50–115. The matter is presently before the court on cities' motion for preliminary injunction pursuant to 15 U.S.C. § 26, which authorizes injunctive relief in a private suit premised on the Sherman or Clayton Acts.

The court has had the benefit of testimony presented during an evidentiary hearing held May 12, 13, and 24, 1983, and has reviewed the briefs submitted by the parties. Prior to the hearing, the Kansas Corporation Commission (KCC) filed a motion for permission to participate in the case as an Amicus Curiae, a motion which the court granted. The court has also reviewed the brief filed by the KCC which addresses certain public interest considerations involved in this case.

The court previously informed the parties by an order dated May 27, 1983, of its decision to grant cities' motion for a preliminary injunction. The timing of that order was necessitated by the June 1, 1983 date,

when the city of Fredonia will be able to begin receiving power from the Nearman Creek generating plant under its contract with the Kansas Municipal Energy Agency. The court wished to provide the parties with as much time as possible under the circumstances to make the necessary arrangements for wheeling the Nearman Creek power. This memorandum sets forth the court's reasons for granting the motion for preliminary injunction.

### Factual Background

Each plaintiff city owns and operates its own electric generation and distribution system. They distribute electricity at retail to customers within their respective service areas. Their service areas include customers within each city, and extend outward to a 3-mile boundary from the city limits. The cities generate some of the power they sell at retail, and supplement their generation capabilities with power purchased at wholesale from Kansas Gas and Electric Company to meet their additional energy demands. The cities have been able to realize a net profit from the operation of their own utility systems.

KG & E is an investor-owned public utility which generates, purchases, transmits at wholesale, and distributes at retail, electric power. Its service area comprises 81,000 square miles of Southeast Kansas. It supplies retail power to 140 cities, and wholesale power to 25 cities. It owns or controls the only electric transmission facilities connected to the cities' distribution lines, and is presently the only supplier of wholesale electric power to the cities. KG & E serves its retail customers in service areas certified by the Kansas Corporation Commission. KG & E serves customers in certified areas adjacent to each of the cities' service areas. KG & E also sells retail power, under franchise agreements, to a company located within Iola's city limits and a company outlying the city limits of Fredonia.

KG & E previously entered into interconnection agreements with the cities. Each contract contains a schedule A, which enables the cities to purchase firm power, or electricity available upon request, from KG & E. Its agreement which Chanute began on July 1, 1970, for an initial period of 20 years. An agreement with Fredonia commenced March 15, 1961, for an initial period of 25 years, and an agreement with Iola commenced April 13, 1962, for an initial 25-year period. These contracts contain many similar terms, including a provision that rate change requests are limited in frequency to, at most, every five years. It is undisputed that this provision is presently a favorable one for the cities. While there is a provision for transmitting power of one municipal customer of KG & E to another, it is also undisputed that the interconnection agreements are silent on the issue of use of KG & E's transmission facilities to transmit power generated by a source other than KG & E.

KG & E is currently seeking a rate change under these contracts. The contracts provide that in the event negotiation over rate change requests are unavailing, the matter is to be submitted to arbitration. Cities have taken the position in arbitration that their current rate should remain unchanged, while KG & E has requested increases in both demand and energy charges. See Amendment No. 32 Schedule A of plaintiffs' exhibits 2, 5 and 9, and plaintiffs' exhibits 4 and 8. The city of Iola will incur whatever energy rate is finally approved, however based upon its past experience of not paying demand charges it does not anticipate incurring the cost of whatever demand rate is ultimately approved. The parties presently await the decision of the arbitrators.

KG & E has adopted a position with regard to furnishing the future firm power energy needs of its municipal wholesale customers. Testifying before the FERC on June 22, 1981, the president of KG & E, Wilson Cadman, responded to questions concerning this position:

"Q So would you say this is a fundamental shift in policy by your company that up to this time you have been willing to serve municipals at wholesale, but for the future you feel you're not going to serve them at wholesale; they ought to fend for themselves?

A   We'll continue to serve them at wholesale as their needs arise.   It is not our intention to build new capacity. They have another option.

Q   Well, to the extent that you have served all-requirements municipal customers for years, it's your position that to the extent they need future requirements, growth, that you are not going to serve them.   They've got to look elsewhere.

A   If they can do that, if they have that option open to them, as do the generating municipals, then yes, that would be the case.   Here again you have to look at a slightly different kind of arrangement.

Q   Well, when did you make this basic policy change, Mr. Cadman?

A   Can't give you an exact date, but it's an accumulation of things.   It's an accumulation of regulatory lag, spiraling interest rates of high cost of construction. It's just a number of things that have caused many policy changes in our business.

.     .     .     .     .

Q   Now, to the extent that a municipal's request of the company for additional firm power required you to construct new facilities, then I take it from what you've been indicating to me earlier today it would be the company position that you would not provide any additional firm power to that municipal.   Is that correct?

A   Yes.   That is our philosophy, except under whatever contractual obligation we have, which I believe I said we would not in any way intend to repudiate."

Plaintiffs' Exhibit 1.   KG & E's position was characterized by Ernest A. Leaman, manager of rates for the utility, as a policy designed to encourage municipalities to develop their own power plans to accommodate future growth needs.

Each city has acquired an outside source of supplemental electricity.   On December 1, 1982, Fredonia entered into a contract with the Kansas Municipal Energy Agency to purchase five megawatts, or 5,000 kilowatts, of participation power in the Nearman Creek generating plant, operated by the Kansas City, Kansas, Board of Public Utilities, for the estimated 30-year life of the plant.   Fredonia is scheduled to begin receiving this power June 1, 1983, and will be liable for demand charges whether or not energy is transmitted.   Patrick R. Flynn, superintendent of Fredonia, estimates that demand charges would be $28,-500 per month, and further estimates the total for the remainder of 1983 to be in excess of $199,000, which would increase in 1984 to $410,000, and in 1985 $499,000.   At least part of this loss would be offset by the fact that power rates under Fredonia's current contract with KG & E are presently lower than the anticipated delivery cost of the Nearman Creek power.

Chanute and Iola each received 5-year allocations of federally generated hydroelectric power from the Southwestern Power Administration (SWPA) scheduled to begin January 1, 1984.   Chanute has been allocated 1,100 kilowatts in 1984 and an additional 700 kilowatts in 1985.   Iola has been allocated 800 kilowatts in 1984 and an additional 600 kilowatts in 1985.   James A. Wilson, superintendent of public utilities for Iola until his retirement two months ago, testified that SWPA preferential power, power available to a public utility, has never been made available to Iola in the past.   Ronald L. Reed, director of Chanute's electric utility, agreed that SWPA hydropower is one of the lowest cost power sources available.   Mr. Reed, as well as Mr. Wilson, anticipate that the cities will seek, at the conclusion of their five-year allotment, to continue their allocations as a preference customer.   It is not disputed that rates under the cities' current contracts with KG & E are presently lower than the estimated delivery costs of SWPA power.

A condition to receiving the SWPA power is that Chanute and Iola secure necessary transmission arrangements by January 1, 1984.   The cities' understanding is that arrangements for transmission should be in place this summer.   The SWPA announced these allocations in the Federal Register on March 24, 1980, and provided:

"In the event the assumptions set forth above prove invalid, or the preference customer (allottee) does not have adequate wheeling or supplemental power sources under contract by January 1 of the year the allottee is scheduled to receive power, SWPA will notify the allottee that such allocation is withdrawn and cite the reasons therefor. Such capacity then available for allocation will be redistributed among those requesting SWPA power on the basis of the foregoing allocation criteria without further public announcement."

Plaintiffs' exhibit 3, *Final Power Allocations,* 45 Fed.Reg. at 19037.

KG & E is not directly interconnected with the SWPA. In order for Chanute and Iola to receive their allotments, it is necessary that they also make arrangements with another utility, Empire District Electric Company, for transmitting power between SWPA and KG & E. Chanute has enlisted the aid of the Kansas Municipal Energy Agency, as dispatching agent, to make the necessary arrangements. Iola has enlisted the services of an engineering firm in Tulsa, Oklahoma, to negotiate, on its behalf, necessary arrangements with Empire District. While no problems have been communicated to the cities, these arrangements have not been finalized.

At the present, to receive outside sources of energy the cities require the services of KG & E to transmit, or wheel, the power through its transmission lines. As this case illustrates, wheeling involves the transmitting of electrical energy generated by one party (SWPA or Nearman Creek) using the facilities of another party (KG & E) for the benefit of a third party (cities). Use of another utility than KG & E to transmit SWPA or Nearman power would require the cities to construct transmission lines to interconnect with that other utility's own transmission lines. The nearest alternative utility transmission line from Chanute is operated by Kansas City Power and Light Company, and is located approximately 20 miles away. KCP & L also operates the nearest alternate transmission lines approximately 15 miles from Iola and 43 miles from Fredonia.

James R. Lucas, manager for system operations of KG & E, testified that to his knowledge KG & E has the present capability of wheeling the cities' current entitlements to firm power from SWPA and Nearman Creek. KG & E has, however, agreed to provide the necessary wheeling services on the condition that the cities enter into new interconnection agreements and accept different terms regarding the purchase of firm power. Mr. Leaman, of KG & E, testified as to his comparison of the delivered cost of energy to the cities under the proposed contracts and under the current contracts assuming KG & E receives its full arbitration request. Based on energy amounts purchased in 1982, Mr. Leaman concluded that the delivered cost under the new contracts would be slightly higher. In addition to providing wheeling services, the proposed contracts would not restrict the frequency of future rate increase requests. Prior to initiating this litigation, the cities made unsuccessful attempts to informally negotiate wheeling services while retaining their existing contracts.

The cities respond that conditioning wheeling on terminating the existing interconnection agreements effectively amounts to an unreasonable refusal to wheel electricity, constituting a violation of federal and state antitrust laws. The cities premised their right to a preliminary injunction solely on the federal antitrust laws, focusing on Section 2 of the Sherman Act which prohibits monopolization, attempts to monopolize, and combinations or conspiracies to monopolize, and rely as well on Section 3 of the Clayton Act and Section 1 of the Sherman Act.

For jurisdictional purposes, the parties have stipulated that KG & E is a "person" within the meaning of the antitrust laws, and that sales of electricity in controversy affect interstate commerce. Plaintiffs' exhibit 1.

*Conclusions of Law*

1. Section 16 of the Clayton Act authorizes injunctive relief for a private antitrust litigant. The statute provides that:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue."

15 U.S.C. § 26. As is apparent, the statute simply recognizes the applicability of traditional equitable principles. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *SCM Corp. v. Xerox Corp.,* 507 F.2d 358 (2d Cir.1974).

2. The oft repeated standard for granting a preliminary injunction recognizes four prerequisites which the moving party must satisfy:

"(1) Substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued would not be adverse to the public interest."

*Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). *See also* 11 Wright & Miller, Federal Practice and Procedure § 2948.

Several circuits, including the Tenth Circuit, in appropriate circumstances apply a variation of this test by adopting a liberal definition of the "probability of success" requirement. Provided the movant prevails on the other prerequisites, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Continental Oil Co. v. Frontier Refining*

*Co.,* 338 F.2d 780, 781–782 (10th Cir.1964) (citing *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953)). *See also Sangmeister v. Woodard,* 565 F.2d 460 (7th Cir.) *appeal dismissed,* 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1977); *Brandeis Machinery & Supply Corp. v. Barber-Greene Co.,* 503 F.2d 503 (6th Cir.1974).

Where, as here, certain relatively complex issues await final resolution upon a trial on the merits, the court believes the modified test is the appropriate standard to apply. Cities have made a showing on the merits sufficient to convince the court that their claims involve substantial questions which are fair ground for litigation and more deliberate investigation.

3. The purpose of a preliminary injunction is to prevent irreparable injury and preserve the court's power to render a meaningful decision after trial on the merits. 11 Wright & Miller, Federal Practice and Procedure § 2947. Normally, the objective of granting injunctive relief is to preserve the status quo in order to accomplish this purpose. *Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181, 1185 (10th Cir. 1975).

A mandatory injunction compelling wheeling would alter the status quo and in effect grant cities a substantial portion of the relief they would be entitled to were they to prevail on the merits after a trial. On the other hand, denial of injunctive relief in this case would not preserve the status quo. Given a denial of plaintiffs' motion, the cities would have two primary options: to accede to KG & E's condition and enter into new interconnection agreements to obtain wheeling services, or to retain their existing contracts and forego their present entitlement to firm power generated by sources other than KG & E. The former alternative affords KG & E the result it ultimately seeks after trial on the merits.

Under the circumstances, the more relevant consideration emphasizes a balancing of the equities with a view toward eliminating any threat of irreparable injury which would impair the court's ability to fashion

meaningful relief after trial on the merits. *Meis v. Sanitas Service Corp.*, 511 F.2d 655 (5th Cir.1975). *See also Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977). Emphasis must also be placed on averting potential harm to the public interest. Accordingly, the court is not persuaded by KG & E's argument that the nature of injunctive relief sought precludes preliminary relief or requires cities to carry an even greater burden of proof on the likelihood of success on the merits than ordinarily applies.

▪ 4. Two elements are necessary to establish a monopolizing violation under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

Monopoly power has been defined as "the power to control prices or exclude competition." *United States v. E.I. Du Pont De NeMours & Co.*, 351 U.S. 377, 391–92, 76 S.Ct. 994, 1004–1006, 100 L.Ed. 1264 (1956). It is violative of § 2 "provided it is coupled with the purpose or intent to exercise that power." *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). Furthermore, "the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there has not been an attempt to monopolize the second market. It is the use of economic power that creates the liability." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

5. Cities and KG & E operate in the retail electric market, are in geographic proximity, and desire to have new customers locate within their respective service areas. As such, they are in competition. *See City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2d Cir.1981). In *Borough of Ellwood City v. Pennsylvania*

*Power Co.*, 462 F.Supp. 1343, 1346 (W.D.Pa. 1979), the court states:

> "For practical purposes, competition between Penn Power and plaintiffs can be seen most strongly in the service of industrial and commercial customers having the option to locate in either the service area of Penn Power or that of plaintiffs. These customers do have a choice of suppliers when making their initial decision to locate their operations.... Plaintiffs and Penn Power also compete, at least theoretically and on a long term basis, for service areas. If plaintiffs were to become unable to serve their customers profitably, Penn Power would logically be in the best position to assume plaintiffs' present service."

The court is also persuaded that potential franchise competition is involved in this case, to the extent that any of the cities, as owners of unprofitable utility systems, would determine it necessary to discontinue operation of their independent systems.

6. To prove a prima facie case, cities rely heavily upon the Supreme Court decision of *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In *Otter Tail,* the Court found an abuse of monopoly power under § 2 of the Sherman Act where the power company refused to sell wholesale power to certain municipalities, or to wheel outside electric power. Franchise agreements between the power company and the municipalities had expired, and the municipalities wished to independently distribute electricity instead of renew the franchises. The power company's monopoly in the transmission market was used to deny access to any sources of wholesale power and effectively to foreclose competition from the municipal systems and preserve the company's monopoly of the retail market.

While *Otter Tail* is instructive on several of the issues raised in this case, there are obvious factual differences. Most notable is the fact that KG & E has not unconditionally refused to wheel electricity to the Cities. Whether the condition KG & E has imposed is reasonable in light of the circum-

stances is an issue that the court believes to be fair ground for litigation and more deliberate investigation.

■ 7. Cities' expert, Edgar H. Bernstein, testified as to his opinion that the relevant geographic market is the combined service territories of KG & E and its municipal wholesale customers. Assuming a relevant product market to be transmission services, KG & E's monopoly power was calculated to be 96% of the market. KG & E's expert, William B. Tye, questioned the relationship of this product market to the geographic market. The court recognizes that establishing the relevant market definitions, and determining the existence of monopoly power, are factual questions which await final resolution at trial. *Borough of Lansdale v. Philadelphia Elec. Co.,* 692 F.2d 307 (3rd Cir.1982). The court believes, however, that cities have raised a substantial question of presence of monopoly power over a relevant market.

8. A more compelling case for monopoly power is made under the cities' "bottleneck" theory of market power. "Under this approach, a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it." *Byars v. Bluff City News Co.,* 609 F.2d 843, 856 (6th Cir.1979). *See also United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912).

Whether KG & E possesses monopoly power under the "bottleneck" theory depends in part on whether KG & E controls "an indispensable facility which cannot be easily duplicated," *Byars v. Bluff City News Co., supra* at 858, or whether it would be "feasible" for cities to construct their own transmission lines to interconnect with an alternative transmission power source. *See Borough of Lansdale v. Philadelphia Elec. Co., supra* at 313. *See also Town of Massena v. Niagra Mohawk Power Corp.,* 1980–2 Trade Cases ¶ 63,526 (N.D.N.Y. 1980). In view of the testimony offered by both cities and KG & E relative to the distance of such a transmission line, the construction costs, and the possible uses of such a line, the court believes the cities have raised more than a substantial ques-

tion as to KG & E's monopoly power over transmission facilities. And as indicated earlier, the reasonableness of KG & E's conduct also poses a serious question for trial.

Moreover, the Kansas Corporation Commission addresses a factor, in its brief, which must also be considered. The KCC observes that under the Kansas Retail Electric Suppliers Act, it is the declared public policy of the state to "(b) avoid wasteful duplication of facilities for the distribution of electricity" and "(c) avoid unnecessary encumbrance of the landscape of the state." K.S.A. 66–1,171. As the KCC's brief notes, this public policy should also be considered where duplicate transmission lines are proposed. Pursuant to K.S.A. 66–1,174, a transmission line interconnecting the cities which would extend beyond three miles from their corporate limits would be subject to the jurisdiction of the KCC. *See* Brief for Amicus Curiae State Corporation Commission of the State of Kansas, Dk. # 40.

9. KG & E contends that cities have an adequate remedy at law in that they can petition the FERC to order wheeling. In the Public Utility Regulatory Policies Act of 1978, Congress amended the Federal Power Act and granted FERC limited authority to order wheeling of power. *See* 16 U.S.C. 824j and 824k. While KG & E does not assert a primary jurisdiction or preemption argument, it does contend that this remedy precludes the cities' right to injunctive relief.

It is instructive to examine the legislative intent as it appears in the conference report to the 1978 Act:

"The conferees intend to preserve the jurisdiction of the Federal and State courts in actions under antitrust laws, whether or not the parties to such actions could have sought remedies under this legislation.

Specifically with regard to certain authorities to order interconnections and wheeling under title II, it is not intended that the courts defer actions arising under the antitrust laws pending a resolution of such matters by the Federal Ener-

gy Regulatory Commission. The conferees specifically intended to preserve jurisdiction of Federal and State courts to resolve, independent of the Commission, such actions, including for example, cases where a refusal to wheel electric energy is alleged to be in violation of such laws. The court should be able to act whether or not action by the Commission under the provisions in title II can be requested or would be justified. In this way, the courts have jurisdiction to proceed with antitrust cases without deferring to the Commission for the exercise of primary jurisdiction."

H.R.Conf.Rep. # 95–1750, 95th Conf.2d Sess., 68 reprinted in [1978] U.S.Code Cong. & Admin.News, pp. 7659, 7802.

It was not contemplated that a court entertaining an antitrust suit should defer to the FERC matters requiring judicial application of the antitrust laws. The court recognizes that the electric utility regulatory scheme and the antitrust laws are to a degree complimentary. See City of Kirkwood v. Union Elec. Co., 671 F.2d 1173, 1178 (8th Cir.1982). However, "[e]nforcing the antitrust laws is not the FERC's paramount objective." Id. See also Florida Power & Light Co. v. FERC, 660 F.2d 668, 677–78 (5th Cir.1981). Accordingly, the court is not persuaded the cities have an adequate remedy at law under such an administrative proceeding.

Moreover, it is not at all clear whether the FERC could even entertain a petition from the cities, since they seek to compel the wheeling of power and KG & E asserts the current contracts as a bar to providing such services. See 16 U.S.C. § 824j(c)(2). See Also Florida Power & Light Co. v. FERC, supra at 672–73; New York State Electric & Gas Corp. v. FERC, 638 F.2d 388, 400–03 (2d Cir.1980).

10. The court similarly does not find persuasive KG & E's contention that the cities have waived their right to preliminary injunctive relief. The utility argues that since Chanute and Iola were aware of their SWPA allotments, as well as KG & E's conditional refusal to wheel, in 1980, the cities' delay in waiting until this year to seek injunctive relief is inconsistent with their claims of irreparable danger. The evidence indicates, however, not inaction on the cities' part but rather attempts to negotiate a resolution and avoid litigation.

11. The prospect that Chanute and Iola will forego their entitlements to SWPA power poses a threat of irreparable injury which the court wishes to avert. Injunctive relief to prevent such an occurrence is particularly appropriate where the hardship to KG & E will be minimal, and where the public interest will be served.

Referring to an order of the Commission attached to its brief, the KCC characterizes SWPA hydro-power as "far and away the cheapest peaking power available from any source." Amicus Brief, Dk. # 40, appendix "C" p. 7. The Commission notes that "such power can help forestall construction of new power plants," and offers its view that the wheeling of SWPA hydro-power into Kansas "is in the long term interest of the State." Amicus Brief, Dk. # 40, pp. 5–6.

Chanute and Iola seek this power both for its anticipated short-term advantages and as a source of low-cost energy to meet their future growth needs. In view of KG & E's position to build no new firm generation capacity to serve the additional growth needs of its wholesale municipal customers, the current availability of SWPA power represents a valuable potential source of energy. While there is no absolute assurance that the cities will continue to receive allocations into the future as preference customers, failure to accept their present allocations may well affect its future availability. See Final Power Allocations, 45 Federal Register at 19036 (referring to preference customers under current contracts, the SWPA notice states that "[c]apacity that becomes available with the expiration of a preference customer contract is to be used for continued service to that preference customer and is, therefore, not available for allocation to others...."). Plaintiffs' exhibit 3.

KG & E argues that cities have an alternative—to sign the new contracts and safeguard their allocations. KG & E asserts

that any damages incurred would then be readily ascertainable. However, initial rates under the proposed contracts would not only be higher than rates under the current contracts after arbitration, they would also be subject to further change upon request. The court believes that the proposed contracts are perceived by the cities as sufficiently deleterious to threaten the loss of the SWPA allocations. The court cannot premise its ruling on the assumption that cities will follow a course that results in substantially increased costs just so their injury can be more readily ascertained after trial on the merits. SWPA energy should not be held hostage to such financial considerations. Nor should the court's decision rest on the state of negotiations with Empire District. Within the context of this case we are compelled to make a determination with the view to preserving the court's ability to render meaningful relief after a trial.

12. Fredonia's situation is different in that its purchase of participation power in the Nearman Creek plant is for the life of the unit. The power source will still be there when its current contract expires. The damages it will incur by retaining its existing contract are composed primarily of the demand charges which, over time, will exceed one million dollars.

While Fredonia's damages are more readily ascertainable, its factual and legal position is so intertwined with Chanute and Iola that a proper presentation of this case to a jury requires similar treatment at this stage of the proceeding. Furthermore, as to all of the cities, and under the particular circumstances of this case, the court is concerned that minimum interim damages be sustained since such injury will ultimately be born by the consuming public.

13. The court finds that the balance of hardships tips in cities favor if injunctive relief is not granted. Cities will be forced to incur substantial damages and a less competitive position under the proposed contracts, or lose the potential advantages flowing from their present entitlements. In either case, the cities bear a disproportionate hardship resulting from KG & E's conditional refusal to wheel.

The utility, on the other hand, would bear significantly less hardship if an injunction is granted. Testimony indicates it has the present capability of wheeling cities' entitlements, and the cities have agreed to pay the prevailing rate for wheeling services. Whatever, if any, loss the utility sustains by way of decreased revenue from its wholesale sales to the cities does not tip the balance in its favor.

14. The requested injunction will not adversely affect the public interest. On the contrary, the public interest favors granting the preliminary injunction to help insure the future availability of relatively low cost alternative sources of power.

Such power serves the purpose of promoting economic efficiency by forestalling costly construction of additional generating plants, and represents a means by which the cities seek to maintain a competitive position vis a vis KG & E and other utilities.

To the extent efficiency and competition result in lower utility rates, the consuming public benefits and the goal of antitrust legislation is furthered. While it is obvious, as KG & E asserts, that electric utilities operate in a highly regulated atmosphere, it is equally well recognized that the industry is subject to antitrust concerns. *See, e.g. Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Otter Tail Power Co. v. United States, supra; Borough of Lansdale v. Philadelphia Elec. Co., supra; City of Kirkwood v. Union Elec. Co., supra; City of Groton v. Connecticut Light & Power Co., supra; Town of Massena v. Niagra Mohawk Power Corp., supra; Sunflower Elec. Coop. v. Kansas Power & Light Co.,* 603 F.2d 791 (10th Cir.1979).

The court also believes it is in the public interest to prevent unnecessary damages from being incurred during the pendency of this litigation. The costs which cities face should an injunction not issue far exceeds the cost to KG & E under an injunction. This additional cost will in some manner be ultimately borne by the public.

15. Cities have agreed, and the court so finds, that they should compensate KG & E for its wheeling services at the prevailing

rate it charges its other municipal customers for wheeling power.

16. The court does not find it necessary at this time to require the cities to furnish a bond. The court is satisfied that the cities are able to respond in damages if KG & E does suffer damages by reason of the injunction. *See Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 782–83 (10th Cir.1964).

This memorandum is the basis for the order entered on May 27, 1983, in which the court granted plaintiffs' motion for preliminary injunction, and ordered KG & E to wheel the cities their current entitlements to power generated by the Southwestern Power Administration and Nearman Creek at the prevailing rate it charges other municipalities for its wheeling services, such rate being subject to approval by the Federal Energy Regulatory Commission. The order further provides that it is unnecessary at this time for the cities to furnish a bond.