STATE of ILLINOIS, in its proprietary
capacity and in its parens patriae
capacity, Plaintiff,

v.

PANHANDLE EASTERN PIPELINE
COMPANY, a Delaware
Corporation, Defendant.

No. 84–1048.

United States District Court,
C.D. Illinois,
Peoria Division.

Jan. 17, 1985.

Hercules F. Bolos, Edward J. Burke, William C. Holmes, Sp. Asst. Attys. Gen., Chicago, Ill., David M. Lynch, Peoria, Ill., for plaintiff.

Mark Howard, Peoria, Ill., Juris Kins, Chicago, Ill., Shirley McGregor Pearson, Panhandle Eastern Pipeline Co., Houston, Tex., for defendant.

## ORDER

MIHM, District Judge.

This Court conducted an evidentiary hearing November 5, 6, 7, 8, 13, 14, 15, 20 and 21 on Plaintiff's motion under Fed.R. Civ.P. 65(a) for a preliminary injunction against Defendant Panhandle Eastern Pipe Line Company ("Panhandle"), pending final determination of this action,

(1) enjoining Panhandle from enforcing the existing Transportation Guidelines;

(2) enjoining Panhandle from promulgating or otherwise imposing discriminatory conditions upon the transportation of natural gas; and

(3) enjoining Panhandle from refusing to transport natural gas when capacity is available to do so, at just and reasonable rates, on a non-discriminatory basis, upon demand.

Plaintiff relies upon the counts in its second amended complaint alleging monopoly leveraging, denial of use of an essential facility, and tying as violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as the basis for the preliminary injunction. The Court finds that it has jurisdiction over the subject matter and parties in this action under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Sections 4, 4C, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, 26, and 28 U.S.C. § 1337.

In *Roland Machinery Company v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir., 1984), the Seventh Circuit stated the principles which must be assessed by the district court in considering a motion for preliminary injunction:

(1) The plaintiff must show that it has "no adequate remedy at law" and that it will suffer "irreparable harm" if the preliminary injunction is not granted.

(2) The plaintiff must show that an award of damages at the end of the trial will be inadequate, i.e., "seriously deficient as a remedy for the harm suffered."

(3) The plaintiff must show "some likelihood of succeeding on the merits."

(4) The court must consider any irreparable harm that the defendant might suffer if the injunction is granted.

(5) The court must balance the harms between the parties. "The more likely the plaintiff is to win (in a trial on the merits), the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor."

(6) Where the court's order will have consequences beyond the immediate parties, the "public interest" must be factored into the weighing process.

*Roland*, at 386–388.

## LACK OF AN ADEQUATE REMEDY AT LAW AND IRREPARABLE HARM

■ *Roland Machinery* requires that Plaintiff show that it has no adequate remedy at law and that it will suffer irreparable harm if the preliminary injunction is not granted. The Plaintiff has shown that it will suffer direct money damages if the injunction is not granted. Money can always be repaid, however, and it appears that the Defendant is in a financial condition to meet any possible monetary judgment.

■ As to indirect monetary and non-monetary harm, Plaintiff has at least conceptually shown that no adequate remedy at law exists and that it and those it represents may suffer irreparable harm. If a residential consumer of natural gas must make a choice between heating her residence or purchasing food, for example, she suffers serious injury which cannot be adequately compensated by monetary damages at some unknown time in the future. An award of damages to compensate for such injuries at the close of trial would be inadequate, i.e., "seriously deficient as a remedy for the harm suffered." *Roland*, at 386.

■ Plaintiff has also advanced the argument that if an injunction is granted, new job opportunities and new money would be brought into Central Illinois. This idea may be sound in principle, but it is not irreparable harm in the traditional sense. Plaintiff has not shown that if the injunction is not granted, jobs will be lost or money will leave Central Illinois in any greater proportion than at present.

## LIKELIHOOD OF SUCCESS

■ One element which Plaintiff must prove for each of its claims is that the Defendant has market power, defined as "the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours and Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The Plaintiff has established a reasonable likelihood of proving that the Defendant has market power. The Defendant has a monopoly on the transportation of natural gas into Central Illinois.

However, there are substantial questions remaining which cast some doubt on Plaintiff's assertions that the Defendant possesses market power, that the relevant geographic market is Central Illinois and that the relevant product market is limited to natural gas. The rates which Panhandle charges for transportation of gas, for example, are set on a system wide basis and are uniform throughout the Panhandle system. Second, industrial users may have the practical ability to make some conversion to the use of alternative fuels. Third, residential consumers have the potential for conservation and reduction of the amount of natural gas used. There is, however, some point at which it is not economically feasible nor physically possible to reduce the amount of natural gas consumed.

In opposing the Plaintiff's position as to the relevant market and the existence of market power, Defendant asserts that there is a possibility of a new interconnection between Central Illinois Light Compa-

ny ("CILCO") and Northern Gas Pipeline Company of America. That interconnection, however, is speculative, and in any case, the Federal Energy Regulatory Commission ("FERC") has limited use of that interconnection to emergency situations.

*MCI Communications v. AT & T*, 708 F.2d 1081, 1107 (7th Cir.1983), requires that in regulated industries, analysis of market power must include consideration of whether regulation precludes a regulated firm from controlling prices or excluding competition and thereby exercising market power. See also *Southern Pacific Communications v. AT & T*, 740 F.2d 980, 1000–1002 (D.C.Cir.1984). Plaintiff's analysis of the market focuses too heavily on the extent of market power in the absence of regulation. There are substantial regulations restraining Panhandle and any analysis of its activities must be made within that regulatory context.

■ In the circumstances of a regulated utility entitled to recover its cost of services and provide its investors with a reasonable rate of return, something more than general intent is required to establish a Sherman Act violation. Plaintiff's showing of specific anti-competitive intent as to each of the allegedly anti-competitive acts attributed to Panhandle is necessary for each of its claims. *MCI v. AT & T*, 708 F.2d at 1108, *City of Mishawaka v. American Electric Power Co.*, 616 F.2d 976, 985 (7th Cir.1980), cert. denied, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981).

The Plaintiff has presented substantial evidence through Panhandle's internal memorandums and conversations that Panhandle acted with anti-competitive intent. To what extent an inference of anti-competitive intent is sound, however, in the context of an alleged free exchange of ideas within a corporation leading to formation of the corporation's ultimate policy is still somewhat unclear. Panhandle's corporate decisions appear to be a reflection of many anti-competitive views tempered by legal concerns of a possible anti-trust violation.

A factor substantially affecting Panhandle's intent is its take or pay obligations.

In the 1970's, as a result of a shortage of natural gas, many natural gas companies entered into a variety of different types of contractual obligations to meet market conditions. Panhandle was under pressure to insure a flow of gas at whatever price was necessary. CILCO, the Illinois Commerce Commission and FERC supported many of the decisions which Panhandle made in that respect. The Defendant appears to have been somewhat less than cautious in protecting itself from changing economic conditions, however, and it appears to have responded more slowly than have some other companies to resolution of problems resulting from the contractual obligations incurred by it in the 1970's.

Panhandle has reduced most of its take or pay obligations to ten percent of what could have been required. However, the remaining take or pay obligations, in the worst scenario, still exist as a sword poised next to Panhandle's corporate throat. It is clear, then, that Panhandle's take or pay obligations have had some effect on its intent in developing the Transportation Guidelines. To what extent that constitutes a legitimate showing of a lack of anti-competitive intent with reference to the corporation's decisions is still unclear to the Court.

*Illegal Tying Claim*

■ A threshold requirement in establishing a tying claim is that the tying item and tied item are separate products. This question focuses on the character of the demand for the two items and the existence of two separate product markets. *Jefferson Parish Hospital District No. 2 v. Hyde*, —— U.S. ——, 104 S.Ct. 1551, 1562–4, 80 L.Ed.2d 2 (1984). In this case, the existence of separate products has been established. The tying item is the pipeline transmission and the tied item is natural gas. These products are perceived as separate. If they are not so perceived by everyone, they are at least perceived in that manner by those in direct contact with the process of purchasing natural gas. The Defendant's expert testified that this situation was a temporary aberation of the market

based on the gas shortage in the 1970's followed by the surplus of gas in the 1980's. It may be that the products are separate on only a somewhat temporary basis, but it is the present tense which controls this litigation.

■ Second, in establishing a tying claim, the Plaintiff must prove that the Defendant has economic power in the tying product market. This has been shown subject to the previously stated provisios.

The Plaintiff must also show that the seller has conditioned purchase of the tying item on the buyer's purchase of the tied item from the seller or that the conduct of the seller has in some other way granted the seller a competitive advantage. See *Jefferson Parish,* supra, *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1949). The Plaintiff has established that both of these elements are present here, although the second is stronger. The chilling effect on the purchase of gas through Panhandle's transmission services, however, may not be as serious as the Plaintiff claims. There is not a great deal in the record showing the practical effects that the Transportation Guidelines have on the purchase of gas. There is, however, no question that the Guidelines give Panhandle a competitive advantage.

■ Finally, a tying arrangement does not constitute a per se violation of the Sherman Act unless there are anti-competitive consequences. Plaintiff must show that forcing occurs and that it forecloses a substantial volume of commerce. *Jefferson Parish,* 104 S.Ct. at 1560. The record in the case at bar is weak on this point.

*Leveraging Claim*

■ The State alleges that Panhandle uses its monopoly power over the transportation of gas into Central Illinois to gain an unwarranted competitive advantage over sales of gas. An activity may be illegal if it merely distorts though does not destroy competition in the gas sales market. See *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2nd Cir.1979), cert. denied 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), *Sargent Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 711–13 (7th Cir.1977), cert. denied 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

The Plaintiff has established with a reasonable likelihood of success that Panhandle possesses monopoly power, with the qualifications previously stated regarding market power. It has also established with a reasonable likelihood of success that Panhandle has exploited its power to gain a competitive advantage in the natural gas market. The Transportation Guidelines create for the Defendant the best of two worlds. The Guidelines give Panhandle the opportunity to always be the provider of natural gas and, if it is not the provider, Panhandle is able to ship the gas and charge for that shipment.

*Essential Facility Claim*

■ With respect to the Plaintiff's essential facility claim, section 2 of the Sherman Act is violated where (1) a monopolist controls an essential facility (2) which competitors cannot reasonably duplicate (3) and denies use of that facility to competitors (4) despite feasibility. *MCI v. AT & T,* 708 F.2d at 1132. In this case, the pipeline is an essential facility; i.e., "an indispensable facility which cannot easily be duplicated." *City of Chanute v. Kansas Gas & Elec. Co.,* 564 F.Supp. 1416, 1422 (D.Kan. 1983). The parties have stipulated that the pipeline cannot reasonably be duplicated. Panhandle has control of that pipeline for the purposes of the allegations in the State's complaint. Regulation of the use of the pipeline is, in many respects, reserved to FERC; but here, the blanket certificate creates a situation allowing for the transportation of natural gas subject to the conditions which *Panhandle* has imposed. Thus, the regulatory controls of FERC are not effective within the context of the allegations raised in this lawsuit.

With regard to the element of denial of use of a facility to competitors, the Court

previously ruled that the Plaintiff need not be a "competitor" of the Defendant in order to pursue this claim. The Court ruled that the Plaintiff, representing the state agencies and the residential customers of CILCO, had standing to pursue its claim. Order of July 10, 1984.

The Defendant has not "denied" use of its facility in a traditional sense. However, a question exists if the Guidelines create an unreasonable interference with use of the facilities. Plaintiff advances significant argument to support this conclusion but its evidence is inconclusive.

With respect to denial of use to the state agencies, a provision in the Guidelines requiring that the volume requested to be transported be at least 100,000 Mcf per year is applicable. The record does not establish that this minimum limit is unreasonable. Panhandle also has the right of first refusal, i.e., the contract price which a user obtains from an off-system supplier is subject to bid out to Panhandle's on-systems suppliers for a possible matching of the price and volume. In the abstract, this requirement surely has a chilling effect on the purchase of natural gas from off-system suppliers. The bid out procedure would certainly lengthen the time required to obtain a supply of natural gas. However, there is little evidence in the record as to the practical negative effect of the bid-out procedure.

The Defendant argues that the possibility that an end user may subsequently solicit a lower bid from off-system suppliers after its bid has been met by an on-systems supplier alleviates any chilling effect on competition. The Court finds this argument to be disingenuous where there is no mention of this possible "auction" procedure within the Guidelines themselves. The Guidelines also contain a provision that contracts for transportation for off-system suppliers are terminable every six months to allow rebidding to on-system suppliers. Again, it *appears* that such a provision would have a chilling effect. It may be fair, for example, to infer from the record that off-system suppliers may not wish to enter into long-term contracts with fixed price and supply requirements. However, there is a paucity of evidence to support this conclusion.

With respect to denial of use of the essential facility to residential consumers, it appears that CILCO has always conditioned the transport of off-system gas on the retention of its G2 status. Significant evidence also exists, however, that retention of the G2 status is immaterial since Panhandle's corporate policy almost certainly would not have allowed the transport anyway.

Finally, with regard to the final element of an essential facility claim, transportation of non-Panhandle gas is feasible.

*Conclusion*

With regard to the likelihood of success on the merits, the Plaintiff has established some elements of each of its claims. As to each claim, however, there is at least one element which is questionable.

BALANCE OF HARDSHIPS

■ *Roland* mandates that the Court consider any irreparable harm that the Defendant might suffer if an injunction is granted. The Court must balance the harms between the parties with an eye to the likelihood of the Plaintiff's success in a trial on the merits. Where the Court's order will have consequences beyond the immediate parties, as in this case, the "public interest" must also be factored into the balancing process. *Roland*, 749 F.2d at 387–388.

The Court is concerned with the claimed effect on the Plaintiff if an injunction is not granted. The state agencies will arguably have to pay a greater amount of money for their energy costs resulting in a greater loss of tax dollars. Residential users will conceivably suffer from economic loss, personal discomfort and hardship, and the loss of new money and jobs in the Central Illinois area. The Court is also concerned with possible irreparable harm which the Defendant may suffer if an injunction is granted. The effect of the corporation's take or pay obligations, for example, argu-

ably could lead to higher gas costs and serious if not catastrophic damage to the company.

The Plaintiff believes that the public's interest is served by the grant of a preliminary injunction. However, damage to the Defendant corporation and higher gas costs could have a serious negative impact on the interests of the public.

CONCLUSION

 The Court must be extremely careful when it is asked to impose an injunction which, in the opinion of the Court, is substantially mandatory in nature. As in *City of Chanute v. Kansas Gas & Electric Co.*, 564 F.Supp. 1416, 1420 (D.Kan. 1983), whichever way the Court chooses to rule in this case will affect the status quo. By granting the relief sought here, however, the Court would be imposing, in effect, a mandatory contract carriage on the Defendant. Whether that is the same as imposing a common carrier status is substantially in dispute. It is, however, a factor weighing against the grant of a preliminary injunction.

There is a question as to the ultimate likelihood of success on the merits with respect to each claim. This case is set for trial on the merits in April of 1985. In this scenario, the Court is unwilling to impose mandatory relief which may cause substantial harm to the Defendant. Thus, Plaintiff's motion for a preliminary injunction is denied. In so ruling, the Court expresses no opinion on the probable merits of the Plaintiff's claim after a full trial on the merits.