**TOWN OF CONCORD, MASSACHU-
SETTS and Town of Wellesley,
Massachusetts, Plaintiffs,**

v.

**BOSTON EDISON
COMPANY, Defendant.**

**Civ. A. No. 87–1881–C.**

United States District Court,
D. Massachusetts.

Aug. 30, 1989.

Charles F. Wheatley, Jr., Wheatley & Ranquist, Annapolis, Md., Neil Motenko, Charles R. Parrott, Nutter, McClennen & Fish, Boston, Mass., Albert S. Robinson (Town Counsel), Grindle, Robinson & Kertzman, Wellesley, Mass., for plaintiffs.

Robert J. Stillman, William G. Meserve, William L. Patton, Ropes and Gray, Boston, Mass., John Desmond, Wayne R. Frigard, Boston Edison Co., Boston, Mass., for defendant.

## MEMORANDUM

CAFFREY, Senior District Judge.

This antitrust matter was tried before a jury during April and May 1989. After thirteen days of testimony, including that of expert witnesses for both the plaintiff Towns and the defendant Boston Edison, the jury deliberated for three days and, on special interrogatories, returned a verdict of $13.1 million for the plaintiffs.[1] Boston Edison now moves for judgment notwithstanding the verdict or, in the alternative, for a new trial. Although this case raises novel issues of law in this circuit, under the well-established criteria governing consideration of j.n.o.v. and new trial motions, the jury's verdict should not be disturbed.

### I. *Background*

As briefly as possible, we begin by summarizing the relevant facts. The plaintiff Towns of Concord and Wellesley ("Towns") are municipal corporations which own and operate electric distribution systems and engage in the retail distribution of electric power. Defendant Boston Edison Company ("BE") is a vertically-integrated power company which generates, transmits, and sells electric power at both wholesale and retail. BE's retail rates are regulated by Massachusetts law and the Massachusetts Department of Public Utilities, while its wholesale rates are regulated by federal law and the Federal Energy Regulatory Commission ("FERC").

BE currently supplies approximately 95% of the Town's power needs. The remaining 5% is "wheeled" to the Towns by BE from the Power Authority of the State of New York ("PASNY"), also known as the New York Power Authority. Concord constructed its power plant in the late 1890s and Wellesley acquired its plant from a BE predecessor in 1906. Throughout most of this century the Towns negotiated what is known as "firm requirements power" contracts with BE. This type of contract provides that the utility company will meet all of the customer's electricity needs during the life of the contract. The Towns have no generating facilities or power lines of their own linking them to other generating facilities and have always relied on BE's transmission lines to bring electricity to their power plants.

In 1980, after the Towns had commenced litigation concerning an earlier disagreement regarding wholesale rates, BE and the Towns entered into a settlement agreement that provided, *inter alia*, that the Town's wholesale rates would increase only when BE also increased its retail rates. *See Towns of Wellesley, Concord and Norwood v. Federal Energy Regulatory Comm'n*, 786 F.2d 463 (1st Cir.1986). *See also* 829 F.2d 275 (1st Cir.1987). This "sequencing" provision was contained in Article 3.4 of the settlement agreement. In January 1984, BE notified the Towns that it was cancelling Article 3.4. In February 1984, BE also announced it was cancelling Article 5.1 of the same agreement, which provided that the Towns' rates would remain constant so long as their "load factor" was 54% or greater. At about this same time, the Towns initiated negotiations with PASNY in order to take advantage of low-cost PASNY hydro-electric power that would become available in mid–1985. On July 1, 1985, the Towns began to receive approximately 5% of their power from PASNY, wheeled by BE through its transmission facilities.

In late 1984, BE filed a wholesale rate increase with FERC. The "S–8" increase, as it became known, contained two steps, A

---

1. The jury found for the defendant on Count II, the Robinson–Patman Act claim.

and B, and increased the Towns' wholesale rate a total of 8.5%. FERC permits wholesale rate increases to go into effect immediately, subject to later review and possible reduction and refund, if necessary. BE filed no corresponding retail rate increase, as the cancelled Article 3.4 had required. In January 1987, BE filed another wholesale rate increase, S8–PR, which raised wholesale rates an additional 4.4%. Meanwhile, the Tax Reform Act of 1986 had reduced BE's federal corporate tax rate. As part of this tax package, Congress mandated rate relief and, in 1987, BE reduced its retail rates—but not its wholesale rates—to reflect these tax savings.

After July 1, 1985, when the Towns began receiving 5% of their power from PASNY, BE continued to charge them as if they were receiving 100% of their power from BE. In 1986, BE sent the Towns a letter explaining that because the Towns had not given BE five years notice concerning their decision to take PASNY power, BE would assess an "adverse financial impact" charge of almost $1 million against the Towns. Additionally, in late 1986 BE completed the construction of Transformer 110–C at Station 292 in Newton, which serves Wellesley, and sought FERC approval to charge Wellesley $761,000 for this new equipment. Eventually an administrative law judge determined that Wellesley was not responsible for any part of the cost of Transformer 110–C.

At trial, the Towns argued that these actions by BE constituted anti-competitive conduct in violation of section 2 of the Sherman Act and section 2(a) of the Clayton Act, codified at 15 U.S.C. § 2 and § 13(a), respectively. Specifically, the Towns charged that BE's wholesale rate increases created a "price squeeze" which forced the Towns to raise their retail rates, reduced the profit margin the Towns historically enjoyed, led to the delay of plant improvements and wage increases for employees, and generally reduced the Towns' ability to be competitive in attracting new, and retaining existing businesses and customers. The Towns also asserted that the wholesale rates BE charges them are effec-

tively higher than what BE charges some of its larger retail customers. The Towns sought damages totalling at least $15 million.

BE now seeks a judgment notwithstanding the verdict or a new trial, arguing primarily that the Towns failed to prove that BE has monopoly power in a relevant market or the existence of a price squeeze, that BE's wholesale rate filings are protected by the *Noerr–Pennington* doctrine, and that there is no actual competition between the Towns and BE. For the reasons stated below, BE's motions should be denied.

## II. *The J.N.O.V. and New Trial Motion Standards*

The principles governing consideration of a motion j.n.o.v. are by now familiar and well-settled in this circuit. The evidence must be viewed in the light most favorable to the plaintiff, giving him the benefit of every favorable inference that may be fairly drawn. If fair minded men may draw different inferences and reasonably disagree as to what the verdict should be, the matter is for the jury. *Borras v. Sea–Land Service, Inc.,* 586 F.2d 881, 885 (1st Cir.1978) (quoting *Dumas v. MacLean,* 404 F.2d 1062, 1064 (1st Cir. 1968)). If, after reviewing the evidence and without weighing the credibility of the witnesses, "there is any substantial evidence supporting the verdict, judgment n.o.v. is improper." *Id.* (citing C. Wright, *Law of Federal Courts* § 95, at 473 (3d ed.1976)). "A jury verdict supported by the evidence may not be set aside simply because the judge would have reached a different result." *Ocean State Physicians Health Plan v. Blue Cross & Blue Shield,* 692 F.Supp. 52, 65 (D.R.I.1988), *aff'd,* 883 F.2d 1101 (1st Cir.1989).

In *Freeman v. Package Machinery Co.,* 865 F.2d 1331 (1st Cir.1988), the court reviewed the principles governing consideration of a motion for a new trial:

> [T]he judge's prerogative to set aside a verdict crystallizes only if "it is quite clear that the jury has reached a seriously erroneous result." *Borras v. Sea–Land Service, Inc.,* 586 F.2d 881,

887 (1st Cir.1978) (citations omitted). In our litany of cases, we have come to refer to this criterion as the "manifest miscarriage of justice" standard ... *Milone v. Moceri Family, Inc.,* 847 F.2d 35, 37 (1st Cir.1988). Put another way, the district court may order a new trial only if it is convinced that the jury's verdict is "against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice ...." *Id.* at 1333 (citing *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); other citations omitted). Setting aside a jury verdict is thus an extraordinary remedy, as it invades "the jury's constitutionally sanctioned role as finder of fact." *Mayo v. Schooner Capital Corp.,* 825 F.2d 566, 570 (1st Cir.1987). It is not enough that "a contrary verdict may have been equally—or even more easily—supportable ... If the weight of the evidence is not grotesquely lopsided, it is irrelevant that the judge, were he sitting jury-waived, would likely have found the other way." *Freeman,* 865 F.2d at 1333–34. The jury's verdict against Boston Edison is not so grotesquely lopsided or unsupported by the evidence that it should be set aside.

### III. *The Substantive Issues*

■ 1. *The Relevant Market.* Defining the relevant market is key to establishing an antitrust violation under section 2 of the Sherman Act. A recent decision of the District Court of Rhode Island offers this succinct definition of the term:

> The terms "monopoly power" and "market power" are generally used interchangeably. "Monopoly power" is the power to control prices or exclude competition in a relevant market. The relevant market is the "area of effective competition" where the defendant operates. Relevant market is identified by the product and its interchangeability plus the geographic area. Usually the trier of fact defines the relevant market.

*Ocean State Physicians Health Plan,* 692 F.Supp. at 67 (citations omitted).

The Towns and BE both presented evidence concerning the relevant market. The Towns' experts defined the relevant market as BE's service area, where it provides electricity to customers at both retail and wholesale, and testified that BE controls 98% of that market. BE's experts defined the relevant market as the entire New England area and parts of New York and Canada, wherever wholesale electricity is available. According to this definition, BE's share is significantly less, amounting to just 15% of the wholesale market in New England. Based on this conflicting evidence and two special interrogatories which squarely addressed the issue,[2] it is clear that the jury performed its fact-finding function and there is sufficient evidence to support its determination.

Case law also supports this definition of the relevant market. The U.S. Supreme Court recognized a relevant market similar to the Towns' definition in *Otter Tail Power v. United States,* 410 U.S. 366, 369–70, 93 S.Ct. 1022, 1025–26, 35 L.Ed.2d 359 (1973) ("The aggregate of towns in Otter Tail's service area is the geographic market in which Otter Tail competes for the right to serve the towns at retail. That competition is generally for the right to serve the entire retail market within the composite limits of a town, and that competition is generally between Otter Tail and a prospective or existing municipal system ... [of these towns] Otter Tail serves 91%...."). The Tenth Circuit has also implicitly done so in *City of Chanute v. Kansas Gas & Elec. Co.,* 754 F.2d 310 (10th Cir.1985), *aff'g* 564 F.Supp. 1416 (D.Kan. 1983) ("cities and KG & E operate in the retail electric market, are in geographic proximity, and desire to have new customers locate within their respective service areas. As such, they are in competition."). And finally, the Seventh Circuit adopted a similar definition in *City of Mishawaka v. American Elec. Power Co.,* 616 F.2d 976

---

**2.** Special questions numbers 1 and 2 asked: "Do you find that plaintiffs proved the existence of a relevant market?" and "Do you find that defendant had monopoly power in the relevant market?" The jury answered "Yes" to both questions.

(7th Cir.1980), *aff'g* 465 F.Supp. 1320, 1325 (D.Ind.1979) ("It is clear that the relevant product market is electric power and energy ... 'The geographic location of the market is usually determined by an examination of the areas in which the particular firm actually competes or operates. If it concentrates its sales and service in one area, this area will normally be the relevant market.' "). There is nothing contradictory in the recent decision in *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307 (3d Cir.1982). In *Lansdale* the Third Circuit explicitly stated that defining the relevant market is a factual matter for the jury, thus rejecting the plaintiffs' argument that the relevant market should, as a matter of law, be considered the utility's service area. This is the exact procedure followed in the case at bar. In addition, unlike in *Lansdale*, substantial evidence exists here to support the jury's definition of the relevant market.

■ In conformity with these cases, the Towns presented substantial evidence from which the jury could conclude that the relevant market is BE's service area, and that BE has monopoly power in this market. Monopoly power in itself is not problematic, of course. The Towns must also prove by a preponderance of the evidence that BE "willfully acquired or maintained that power through restrictive or exclusionary conduct" and that the Towns were "injured in [their] business or property because of [BE's] restrictive or exclusionary conduct." *Ocean State Physicians Health Plan*, 692 F.Supp. at 67 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). In order to determine whether the Towns suffered any injury to their business or property, we turn to BE's next argument.

■ 2. *The Price Squeeze.* The Towns presented evidence of their injuries in the form of expert testimony concerning a price squeeze resulting from the interplay of BE's wholesale and retail rates. Essentially, BE argues that because FERC eventually determined a "just and reasonable" wholesale rate for the period covered by the S–8 filing, this rate cannot possibly subject BE to antitrust liability. The jury's verdict, in BE's view, "makes a shambles of the regulatory scheme."

It is necessary to place this argument in its proper context. In 1972 the U.S. Supreme Court rejected a similar argument:

Otter Tail contends that by reason of the Federal Power Act it is not subject to antitrust regulation with respect to its refusal to deal. We disagree with that position.

"Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." ... Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws.

*Otter Tail Power Co.*, 410 U.S. at 372, 93 S.Ct. at 1027 (quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963)). This basic principle was restated more forcefully in 1976:

Indeed, since our decision in *Otter Tail Power Co.* ... there can be no doubt about the proposition that the federal antitrust laws are applicable to electric utilities.

*Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596 n. 35, 96 S.Ct. 3110, 3120 n. 35, 49 L.Ed.2d 1141 (1976). Subsequent case law has further refined how this principle operates in a dual-regulation setting, where retail rates are regulated by the state and wholesale rates by FERC. As the Eighth Circuit has described the problem, "the FERC and [the state] each has authority over only one end of the alleged price squeeze, while the antitrust laws can address the entire problem." *City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1178 (8th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983). Furthermore,

[e]nforcing the antitrust laws is not the FERC's paramount objective, and the only remedy the FERC can grant is to reduce the wholesale price to the lower end of the "zone of reasonableness," ...

which, depending on where the retail price is set, may or may not be enough to eliminate the price squeeze.

*Id.* (quoting *Federal Power Comm'n v. Conway Corp.*, 426 U.S. 271, 279, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976)). After considering arguments identical to those advanced by BE, the Eighth Circuit concluded:

> In sum, the courts may consider a price-squeeze claim without infringing on the regulatory jurisdiction of the FERC and [the state], because the question is not whether the rates themselves are anti-competitive, but whether the defendant utility acted illegally in proposing a certain anti-competitive combination of rates.

*Id.* at 1179.

As a matter of law, therefore, BE's price squeeze argument is incorrect. Because the Towns presented substantial evidence concerning the effect of the price squeeze on their profit margin, plant improvement, wages, and so on, we find no ground here for disturbing the jury's verdict.

■ 3. *The Noerr–Pennington Doctrine.* Incredibly, BE asserts that the jury's verdict must be overturned on the basis of the *Noerr–Pennington* doctrine, which protects the first amendment right to make one's views known to the government. BE's argument that *Noerr–Pennington* insulates its rate filings from the antitrust laws has been soundly rejected by numerous courts. *See, e.g., Cantor v. Detroit Edison Co.*, 428 U.S. at 601–02, 96 S.Ct. at 3122–23 ("[N]othing in the *Noerr* opinion implies that the mere fact that a state regulatory agency may approve a proposal included in a tariff ... is a sufficient reason for conferring antitrust immunity on the proposed conduct."); *City of Kirkwood*, 671 F.2d at 1181 ("The *Noerr–Pennington* doctrine will not protect a utility which manipulates the federal and state regulatory processes to achieve anti-competitive results. It is not for expression of opinion that Kirkwood seeks to compel UE to respond in damages, but rather for UE's conduct in the market place."); *City of Mishawaka,*

616 F.2d at 982 ("It appears to us that the municipalities are not barred by *Noerr–Pennington* ... Were we to view it otherwise, the federal and state regulatory processes would provide the utility with a method of effectively advancing its illegal monopolistic purposes while maintaining an outward appearance of total innocence and shielded from the Sherman Act"). We need go no further. The *Noerr–Pennington* doctrine simply does not apply to the case at bar.

■ 4. *Competition.* BE also argues that there is no evidence in the record of "actual" competition between it and the Towns. Admittedly, "[i]t is inherently difficult to define competition in the electric-power industry...." *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 930 (2d Cir.1981). Numerous courts have confronted the issue, however, and the most widely accepted definition of competition in this setting is derived from *Borough of Ellwood City v. Pennsylvania Power Co.*, 462 F.Supp. 1343, 1346 (D.Pa. 1979):

> Not only does Penn Power sell power to plaintiffs at wholesale rates, but it is also engaged in the retail distribution of power to customers in the area surrounding plaintiffs' service area ... For practical purposes, competition between Penn Power and plaintiffs can be seen most strongly in the service of industrial and commercial customers having the option to locate in either the service area of Penn Power or that of plaintiffs ... If the retail rates of plaintiffs and Penn Power differ, the location choice of the potential customer can be affected by the differential. Plaintiffs and Penn Power also compete, at least theoretically and on a long-term basis, for service areas. If plaintiffs were to become unable to serve their customers profitably, Penn Power would logically be in the best position to assume plaintiffs' present service.

*Id.* As the Second Circuit observed, in this context FERC has recognized three types of competition:

> [c]ompetition for individual customers, including large industrial or commercial

**1462**

loads; franchise competition, for the right to serve all of the customers in a given territory ...; and fringe area competition, for customers on the fringes of the present service areas of rival utilities.

*City of Groton,* 662 F.2d at 930. On facts similar to those of the case at bar, one court found as follows:

> The court is also persuaded that potential franchise competition is involved in this case, to the extent that any of the cities, as owners of unprofitable utility systems, would determine it necessary to discontinue operation of their independent systems.

*City of Chanute,* 564 F.Supp. at 1421.

In conformity with these definitions of competition, the Towns presented evidence and testimony concerning the negative impact of the wholesale rate increases (potential franchise competition); the importance of competitive retail rates to customers straddling the Towns' borders, such as Wellesley College (fringe area competition); and the similarity between the Towns' wholesale rates and the retail rates BE charges some of its large industrial and commercial customers (individual customer competition). BE offered evidence and testimony that disputed the existence of competition in these areas, and the jury's factual determination favoring the Towns is permissible.

5. *Miscellaneous Issues.* BE asserts that the Towns presented no "competent" evidence of damages. The Towns' expert, Dr. Wilson, did testify concerning his calculation of damages, just as BE's expert, Dr. Pace, testified that he could find no damages. In the words of the Third Circuit:

> The battle of experts was waged in the trial court before the jury. The jury resolved the factual dispute. What Lansdale lost, fairly and squarely, at the hands of a jury cannot be retrieved by converting a factual controversy into an issue of law.

*Borough of Lansdale,* 692 F.2d at 313. BE also argues that the jury instructions "materially prejudiced" BE's rights. We can only respond that we believe the jury in-

structions and the special questions accurately and exhaustively detailed the applicable law and those areas where the jury had to resolve factual issues, including the burden on each party. We find BE's remaining arguments unpersuasive.

## IV. *Conclusion*

After careful review of the record, we find that substantial evidence exists to support the verdict, thus precluding BE's motion for judgment n.o.v. We also find that the evidence presented at trial is not so lopsided as to constitute a manifest miscarriage of justice, thus precluding BE's motion for a new trial.

So ordered.